Shaler *v.* Trowbridge.

---

 BRAINARD SHALER and others, appellants,

and

MARY E. TROWBRIDGE and others, respondents.

1. Where a partner fraudulently misappropriates the money of his firm, and purchases, in his own name, real estate and policies of life insurance, with firm funds, he will, in equity, be charged, by construction, as a trustee for the partnership.

Shaler *v.* Trowbridge.

2. Where all the premiums are paid with partnership moneys, it makes no difference that the fraud-doer, in his life-time, changed the life policies so as to make them payable to his wife. She, having paid no consideration for them, will be charged as a trustee for the firm, and will be permitted to derive no benefit from them.

This cause was argued at May Term, 1876, before Hon. Amzi Dodd, a special master, to whom it had been referred by the chancellor. The facts sufficiently appear in his opinion, and in that delivered on the appeal.

*Mr. J. F. McGee,* for appellants.

*Messrs. Tuttle & Griggs,* for respondents.

THE MASTER.

This is a suit by three surviving partners against the widow, the heir at law, and the administrator of the deceased partner. The disputed question discussed at the argument relates exclusively to the widow, and is the question whether certain real estate and certain policies of life insurance, to which she held the legal title at her husband's death, should be decreed to be, in equity, the property of the firm.

From the pleadings and proofs, I find the facts of the case to be these: On the 2d of January, 1865, the four partners composing the firm, to wit, Joseph A. Trowbridge, of Hackensack, in this state; Brainard Shaler and John Kiersted, of Saugerties, and Wynkoop Kiersted, New York, entered into articles to form a limited partnership in the hide and leather business, to be carried on in the city of New York; Trowbridge and Shaler, whose names were to be the style of the firm, to be general partners, and the two Kiersteds, special ones; Trowbridge to put in no capital except his skill and knowledge of the business, Shaler to put in the sum of $50,000, in cash, and the two Kiersteds the sum of $37,500 each; Trowbridge and Shaler to give the skill, time and labor, and to keep true books of account, which were

Shaler *v.* Trowbridge.

to be settled on the 1st of January in each year, when a balance-sheet was to be made out and furnished to the special partners; a division of the profits to be made at those dates, one-third to Trowbridge, one-third to Shaler, and to the remaining partners one-sixth each; the two general partners to draw, from time to time, moneys necessary for their personal expenses, not exceeding $5,000 each per annum; the copartnership to commence January 2d, 1865, and to end January 1st, 1868. The cash capital called for by the articles was contributed, and the business carried on for three years, when the partnership period was agreed to be extended to January 1st, 1871. It was terminated by Trowbridge's death, December 14th, 1869. During its entire continuance Trowbridge had charge and control of the books and the financial part of the business. The yearly balance-sheets, beginning January 1st, 1866, and ending January 1st, 1869, made up and furnished by him to the firm, and which were found, after his death, to have been fraudulent and false, were made up from the books as kept or directed to be kept by him. He alone drew the firm checks, and was the exclusive manager of its money affairs. Shaler spent the first year of his partnership at his tannery, in Ulster county, and was afterwards engaged in the store in New York, but he made little if any other examination of the books and accounts than was made by the special partners, who gave them only an occasional inspection. All the yearly partners regarded the yearly balance-sheets as true exhibits, and appear to have relied, without distrust, upon Trowbridge's honesty and capacity in the business. Upon his death the deceptive and defective manner of keeping the books was discovered. More than five hundred of the firm's checks were found to have been given by him for his individual use, and paid at bank, none of which had been charged in the firm accounts or against himself, or were included in the yearly balance exhibits. Of many of these checks no entry appeared in the stubs of the check-books, and when an entry did appear, it was, in many

instances, accompanied with an abbreviation, falsely indi-
cating that it had been charged in the regular accounts.
The total amount of these uncharged checks was the sum
of $103,155.97. The total amount drawn by Trowbridge
during his partnership life, and actually charged to his
account, was, at the same time, in excess of what the articles
allowed, and exceeded his share of the profits by upwards
of $15,000. The amount of these illegitimate drafts during
the first two years, from January 1st, 1866, was $34,150;
during the year 1868, $40,191.80, and in 1869, $19,474.87.
In what manner much of these sums was expended is dis-
closed by the proofs. A few examples will suffice. Prior to
May 30th, 1866, Trowbridge was unmarried. On October
19th, 1865, he gave the firm's check for $1,300, in gold, to
Tiffany & Co., for a diamond ring, presented to the lady
then his intended wife, and now his widow; March 1st,
1865, a check for $130.25, to the leader of the Seventh
Regiment Band, of New York, for music furnished to
sociables at Hackensack; April 21st, 1865, a check for
$41.72, to a New York firm, dealers in groceries, liquors
and segars, of whom he bought supplies; June 20th, 1866,
a check for $575, for flowers furnished at his wedding. The
whole of the moneys paid for policies of life insurance and
the real estate now in controversy, was paid by checks of
this class. The three policies were issued May 1st, 1866,
by three companies in New York, one for $20,000 and two
for $10,000. The half-yearly premiums on these policies,
being together the sum of $529.30, were paid every six
months, by an uncharged check, to the agent through
whom the transactions with the companies were made : the
first payment May 1st, 1866, and the last October 25th,
1869. The three policies as first issued were in favor of
Trowbridge himself, but in April, 1868, they were changed,
at Trowbridge's request, so as to be payable to his wife.
The real estate consists of two adjoining tracts in Hacken-
sack, one a house and lot, purchased April, 1868, of Thomas
Voorhis, and the other purchased shortly after, of Tunis

Shaler *v.* Trowbridge.

Banta. The sum of $8,500 was paid in cash for the first, subject to an existing mortgage thereon for $4,500. The sum of $800 was paid, in cash, for the second, and a mortgage given for $1,000, the balance of the price. Both tracts were conveyed to Mrs. Trowbridge, the defendant. As before stated, the payments on these purchases were made by checks included in the amount uncharged, as above explained. The same is true of subsequent expenditures for improvements and repairs. After the death of Trowbridge, which was caused by his own hand, and was attributed to temporary insanity, the amount of the policies was collected by Mrs. Trowbridge from the companies.

Upon the foregoing facts the question is, whether the real estate and proceeds of the policies should be decreed to be held in trust by the widow, and as the property of the firm. The contention of the complainants to this end is upon the ground that the property was wholly purchased with the firm moneys, and that a resulting trust consequently exists in their favor. I am of the opinion that this claim is a good one, and that the resulting trust should be enforced. The equitable doctrine applicable to the case is well settled. If a person, having a fiduciary character, purchase property with the fiduciary funds in his hands, and take the title in his own name, a trust in the property will result to the *cestui que trust* or other person entitled to the beneficial interest in the fund with which the property was paid for; or, if a partner purchase lands with partnership funds, and take the title to himself, a trust will result to the partnership. The rule embraces personal property, as well as real estate, and if a man purchase a bond, annuity, stock, mortgage, or other personal interest, in the name of a third person, the equitable ownership results to the person from whom the consideration moves. 1 *Perry on Trusts*, §§ 127, 130; *Johnson* v. *Dougherty*, 3 *C. E. Gr.* 406; *Cutler* v. *Tuttle*, 4 *C. E. Gr.* 558.

*Dyer* v. *Dyer*, 1 *Lead. Cas. in Eq.*, p. 165, illustrates, with great fullness and particularity, the doctrine of resulting

trusts. The points raised by defendants' counsel are answered by the following citation: . " The trust is not an interest in the proceeds of the land, nor a lien upon it for the advance, nor an equity or right for a sum of money to be raised out of it, or upon the security of it. There can be no resulting trust of an estate to a particular extent of its value, leaving the residue of the value in the grantee. The principal, or *cestui que trust*, is entitled to the money or the bond, at his option." There is nothing in the character of a life insurance policy to exempt it from the equitable rule. The investment of the trust funds in such a policy may or may not be productive when the policy is terminated by death; the sum paid on it at maturity may be more or less than the premiums paid. But this circumstance of contingent value does not distinguish it from the purchase of an annuity, or from stock or other article whose value is liable to vary with circumstances. The principle that a trustee cannot lawfully derive personal benefit from the trust funds misused, forbids, in each case alike, a settlement simply by the repayment of the moneys appropriated and the retention of the balance arising from the gains of the transaction. It is undeniable, in the present case, that all the premiums on the policies and all the purchase-moneys of the land were paid with the moneys of the firm, which the partners held in trust. The transfers to his wife do not divest this trust; it is not alleged that any part of the price proceeded from her. It was said, at the argument, that some part of the proceeds of the policies had been lost by her, under circumstances that would entitle her to be allowed the amount so lost. No evidence, however, on this point appears in the case. It is alleged, in the pleadings, that a policy held by Trowbridge in his own name at his death, for ten thousand dollars, went to his administrator, and that a lot of land, of which he died seized, purchased in the same manner as the tracts above mentioned, descended to his infant son and heir. Both the adminis-

Shaler v. Trowbridge.

trator and heir are parties to the suit, but no controversy was had respecting a decree against them.

I will advise in accordance with the above.

The opinion of the court of appeals was delivered by

VAN SYCKEL, J.

In January, 1865, Joseph A. Trowbridge, Brainard Shaler, John Kiersted and Wynkoop Kiersted entered into partnership in the leather business, which was terminated by the death of Trowbridge, December 14th, 1869. During its continuance, Trowbridge had charge of the books and finances. The contested question on this appeal is, whether certain real estate and certain policies of life insurance, to which Mary E. Trowbridge held the legal title at her husband's death, should be decreed to be in equity the property of the firm? The evidence shows that Trowbridge alone drew the firm checks, and exclusively managed its money affairs, and that the yearly balance-sheets, made up and presented by him to the firm, were false and fraudulent. Checks of the firm to the amount of $103,155.97 were drawn by him to his own individual use, and paid at the bank, none of which were either included in his yearly balance-sheets, or charged to him on the books of the firm. At the same time the amount drawn by him during the existence of the partnership, and actually charged to his accounts, exceeded what he would have been entitled to, by the articles of copartnership, by more than $15,000; so that, upon an adjustment of the partnership concerns, he will be indebted to the firm in more than $118,000.

Out of the moneys drawn upon the uncharged checks, or by the checks themselves in some instances, Trowbridge paid for the real estate and the policies of insurance now in controversy. The policies were issued, in the first place, in favor of Trowbridge himself, and the half-yearly premiums paid by the uncharged checks of the firm to the insurance company's agent. In April, 1868, they were changed, by

Trowbridge's request, so as to be payable to his wife, who, after her husband's death, received the several amounts due upon the policies from the insurance companies. Upon this statement of facts, which the case satisfactorily establishes, shall the real estate, and the proceeds of the policies, be declared to be held in trust by the wife as the property of the firm ?

This is not a case of resulting trust, where the trust results, or is implied, from the contracts and relations of the parties. It arises, *ex maleficio*, out of the active fraud and dishonest conduct of the partner Trowbridge, and may be termed a constructive trust, which equity will fasten upon the conscience of the offending party, and convert him into a trustee of the legal title, and order him to hold and execute it in such manner as to protect the rights of the defrauded party, and promote the interest and safety of society. It differs from other trusts in that it is not within the intention or contemplation of the parties at the time the contract is made upon which it is construed by the court, but it is thrust upon a party contrary to his intention and against his will. 1 *Perry on Trusts*, § 166.

If a person, occupying a fiduciary capacity, purchases property with fiduciary funds in his hands, and takes the title in his own name, he will, by construction, be charged as a trustee for the person entitled to the beneficial interest in the fund with which such purchase was made. This rule applies to a partner who fraudulently purchases for himself with the partnership funds, and it extends to personal as well as real estate ; in every case the equitable ownership rests in the person from whom the consideration moves. *Johnson* v. *Dougherty*, 3 *C. E. Gr.* 406 ; *Cutler* v. *Tuttle*, 4 *C. E. Gr.* 558 ; *Dyer* v. *Dyer*, 1 *Lead. Cas. in Eq.* *203 ; 1 *Perry on Trusts*, §§ 127–130.

In *Taylor* v. *Plumer*, 3 *M. & S.* 575, Lord Ellenborough said that if A is trusted by B with money to purchase a horse for him, and he purchases a carriage with that money, B is entitled to the carriage. That it made no difference,

Shaler *v.* Trowbridge.

in reason or in law, into what other form, different from the original, the change may have been made, for the product of or substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right ceases only when the means of ascertainment fail. This is declared to be the settled rule, in *Story's Eq. Juris.*, §§ 1258, 1259.

So completely are the two things identified, even at law, where the conversion can be clearly traced, that in equity a distinction can never be drawn, between the money misappropriated and the results of its investment, in favor of the fraud-doer.

Nor does it make any difference that the investment turns out to be a profitable one, for, whatever the profit may be, it must belong to the *cestui que trust.* It is a constructive fraud upon the latter to use his property unlawfully and to retain the profit of the misapplication, it being a fundamental principle in regard to a trustee that he shall derive no gain to himself from the employment of the trust fund. 2 *Story's Eq. Juris.*, § 1261; *McKnight's Ex'rs* v. *Walsh*, 9 *C. E. Gr.* 509.

Much more does public policy require that one who has corruptly thrust himself into the position of a trustee, shall not profit by his fraud. The fact that this property has been passed into the hands of the wife does not prevent the application of these equitable principles. She received it as a gift from her husband, without paying any consideration whatever for it. Where once a fraud has been committed, not only is the person who committed the fraud precluded from deriving any benefit from it, but every innocent person is so, likewise, unless he has, in good faith, acquired a subsequent interest for value; for a third person, by seeking to derive any benefit under such a transaction, or to retain any benefit resulting therefrom, becomes *particeps criminis*, however innocent of the fraud in the beginning. 1 *Perry on Trusts*, § 172, and cases cited.

It·is urged that a life policy should be exempt from the equitable rule which applies to other transactions, because it differs in its character from ordinary investments; and is a beneficent provision for the family, which should be favored.

Public policy clearly forbids the adoption of this suggestion ; it would invite the commission of the wrong by assuring the wrong-doer that there is one mode in which he could surely profit by his turpitude, in securing a provision for his family. The policy is the thing which the partnership money purchased, and it stands in the place of what was corruptly abstracted. Whether the policy would be productive, when terminated by death, of more or less than the premiums paid upon it, would depend upon the length of the life insured. The fact that it has a contingent value · does not distinguish it, in principle, from an investment in the purchase of stock, or of an annuity, and can give no support to the claim of the widow, that nothing should be exacted of her beyond the amount of premiums paid upon it out of the firm funds. If this suit had been prosecuted in the life-time of the husband, and the policy had been disposed of to the company for its surrender value, it would hardly have been insisted that he could claim, in a court of conscience, a right to. any excess of the proceeds after refunding to his firm the amount of the premiums. All the premiums were paid with the partnership funds — nothing was paid by the wife. The transfer to her, therefore, cannot change the equities, nor divest the trust.

The inflexible rule, in equity, will be equally violated, whether she takes the value of the policies in excess of the premiums paid, or the appreciation in the real estate.

Trowbridge contributed nothing, in money or otherwise, to the purchase or support of the policies. The entire sum derived from them is the product of the partnership money. He did no act upon which he could have based the slightest claim in equity to be benefited by the transaction. It would be idle to denounce his turpitude, and, at the same time, to

reward it by allowing him to transmit its fruits to his family. His wife can derive, through so corrupt a source, no equitable rights to these policies; neither public policy, nor the intrinsic justice of the case, would be promoted by permitting her to do so.

In my opinion, the decree below should be affirmed, and the case remitted, that it may be proceeded in accordingly.

Decree unanimously affirmed.